## Appeal of COOK CHINA CO.            Docket No. 419.

A deduction from gross income, based upon an alleged exhaustion or depreciation of claimed capital values, can be allowed only when such capital values are capable of being definitely determined and expressed in terms of dollars.

The evidence in this appeal is insufficient to furnish any reliable basis for computation or support any formula by means of which the expectation of profits to be derived from a contract for the manufacture and sale of merchandise can be translated into terms of dollars and, therefore, the claim for exhaustion must fail.

Submitted December 2, 1924; decided December 29, 1924.

*W. A. Bolinger, Esq.*, for the taxpayer.

*Lawrence Graves, Esq.*, (Nelson T. Hartson, Solicitor of Internal Revenue) for the Commissioner.

Before JAMES, STERNHAGEN, TRAMMELL, and TRUSSELL.

At the hearing of this appeal Charles Howell Cook, president of the Cook China Co., was sworn and testified on behalf of the taxpayer, and there were submitted identified copies of two contracts with Albert Pick & Co. dated February 15 and November 6, 1917, respectively, from which the Board makes the following

### FINDINGS OF FACT.

The taxpayer is a corporation organized on March 28, 1917, under the laws of the State of New Jersey with an authorized capital of $100,000 for the purpose of engaging in the manufacture and sale of dishware. At the time of the organization Charles Howell Cook caused to be conveyed, assigned, and paid in to the corporation properties described and valued as follows:

| | | |
|---|---:|---:|
| Land | $20,000 | |
| Buildings | 40,000 | |
| Total | 60,000 | |
| Less mortgage | 32,000 | |
| | | $28,000 |
| Kilns | | 10,000 |
| Machinery and equipment | | 5,000 |
| Cash | | 1,000 |
| Subscription for stock, later paid in in cash | | 31,000 |
| Contract with Albert Pick & Co | | 25,000 |
| Total | | 100,000 |

for all of which the corporation issued to Charles Howell Cook, or his nominees, all of its authorized capital stock of the par value of $100,000.

The Albert Pick & Co. contract, hereinafter called the Pick contract, is an agreement entered into and executed on February 15, 1917, by and between Charles Howell Cook and Albert Pick & Co., and contained, among other things, recitals to the effect that:

(a) Albert Pick & Co. agreed to loan to Cook the sum of $30,000 to be repaid over a period of four years with interest at 6 per cent.

(b) Cook agreed to put into operation a plant commonly known as the Etruria Pottery at Trenton, N. J., and proceed as rapidly as possible to manufacture dish ware and to begin the delivery of such dish ware to the Pick Co. on or before July 1, 1917.

(c) The Pick Co. agreed to purchase and pay for pottery manufactured by Cook in amounts valued as follows:

1. During the year beginning July 1, 1917, dish ware worth $75,000 at certain specified prices named in the contract, and during each of the following five-year periods dish ware valued at the sum of $100,000 per year at prices agreeing with the prices of similar products produced by other manufacturers, and further that said Pick & Co. could have, if they so desired, any additional quantities of dish ware manufactured by Cook during the six-year period for which this contract was to run.

2. There was also in this contract a recital as follows:

(4) The first party agrees that if the operation of the said pottery shall show a profit of more than ten per cent (10%) of the total sales during any year between July 1, 1917, and July 1, 1923, he will pay to the second party herein a sum equal to one-half of the excess profit over said ten per cent (10%).

The Cook China Co. in consideration of the assignment of this contract issued to Cook capital stock shares of the par value of $25,000. A supplemental contract modifying the prices to be paid by the Pick Co. for dish ware during the period from the date of the supplemental contract to July 1, 1918, was entered into on November 6, 1917.

There has been a substantial performance of this contract and during the first three and one-half years of operation under it Albert Pick & Co. received and accepted deliveries of dish ware of the value of $365,546.11, although the contract only called for the delivery of $325,000 worth during said three and one-half years.

It was the general practice of concerns engaged in a business similar to that of this taxpayer to allow salesmen commissions of approximately 10 per cent upon all sales. Under the contract with Pick & Co. the taxpayer made its sales and deliveries without being required to pay any commissions. On a basis of paying commissions of 10 per cent it would have cost the taxpayer $57,500 over a period of six years to effect the sales covered by the contract. Such a cost discounted to a present worth (or present cost) basis would exceed $25,000.

In its income and profits tax return for the year 1918 the taxpayer claimed a deduction on account of the alleged depreciation of this contract with Albert Pick & Co. in the amount of $4,545.46. This deduction the Commissioner has disallowed, and in auditing the taxpayer's return for the year 1918 has found a deficiency in the sum of $2,839.70, from which determination the taxpayer brings this appeal.

#### DECISION.

The deficiency as determined by the Commissioner in the sum of $2,839.70 is approved.

#### OPINION.

TRUSSELL: The taxpayer in this appeal, at the time of its organization, became the owner of a contract for the production and sale of merchandise to be performed over a period of six years, involving more than half a million dollars worth of merchandise at the selling prices, and took this contract into its capitalization at a stated value of $25,000 for which stock shares were duly issued. This contract had been negotiated a few days before it was assigned to the tax-

payer by Charles Howell Cook, who was also the promotor and sole beneficial stockholder of the taxpayer corporation.

The question for our determination is: Did this contract, at the time it was assigned to the taxpayer corporation, have such a capital value as will warrant its being written off for exhaustion over the term it was to run, under that provision of the Revenue Act of 1918 authorizing a deduction from gross income for the exhaustion of property used in business?

When men enter into business contracts they expect that operations under such contracts will prove profitable and beneficial. This expectation is the motive for making the contract and the expectation of profits to be derived from business contracts is the foundation of a large portion of the world's business.

We have no doubt that in many instances contracts of a character similar to this one do immediately upon their execution possess elements of considerable value and that such value may be established by competent evidence respecting the terms and conditions of operation under the contract. Such value inherent in a contract at the time of its execution, however, must be established by reliable evidence, and we are of the opinion, should also be supported and corroborated by proof of profitable operations under the terms of the contract. The one fact relied upon in this case, the absence of the necessity of paying selling commissions, although an important and favorable factor, is not sufficient to prove value in the absence of evidence showing that profits were reasonably anticipated and that operations under the contract itself produced profits, and it is not even shown in this case that the absence of the necessity of paying selling commissions was not taken into consideration in arranging the terms of the contract.

The deduction from gross income which the law authorizes is for the replacement of capital values as such values gradually become exhausted. The computation of gross income and of deductions therefrom must be made in terms of dollars and it seems to follow that capital values, before they can be subject to exhaustion for the purposes of the income-tax law, must also be expressed in terms of dollars.

The evidence presented in this case shows that the contract under consideration contained terms and conditions which could easily be regarded as warranting the confident belief that operations under it would be unusually profitable to the producer.

The contract provided for the production and sale of $575,000 worth of merchandise over a period of six years. The buyer was one of the largest dealers in such merchandise in the country. The prices, after the first year, were to be measured by the going prices of other manufacturers for such years, and the goods could be produced and delivered without any selling expense or other costs, except the cost of production and of shipping. All of these facts combined to make a situation which would no doubt have convinced any business man that this contract was valuable. This value, however, was undetermined and rested wholly upon expectations of profitable operations under the contract.

Following the taking over of this contract the taxpayer organized its production business, produced goods and delivered them under the contract and produced other goods and sold them to the general

trade.  It appears that for several years its business did result in some annual profits, but whether such profits arose from the goods produced and sold under the contract or whether they arose from goods produced and sold to the general trade does not appear from the evidence, and the record is wholly silent as to whether or not operations under this contract actually resulted in profits.  We are, therefore, uninformed as to whether the expectation of realizing profits from this contract, which its maker and the taxpayer relied upon, was ever realized.  The mere fact that the goods produced and delivered under the contract were not subject to salesmen's commissions, and perhaps other selling expenses, is not sufficient, without other evidence, to prove value in the contract, and we are unable to accept the taxpayer's contention that the then present worth of salesmen's commissions, which might have been paid upon a volume of sales equal to that described in the contract, is proof of a capital value inherent in the contract.  We are also of the opinion that the transfer of this contract from Cook to the taxpayer corporation did not in itself establish a capital value.  We take this view for the reason that Cook was himself the promoter and was to become the sole beneficial stockholder of the corporation, and the transaction was not one between independent minds making a sale and purchase upon which a selling value could be predicated.

This leads us to the conclusion that the evidence in this case is insufficient to furnish any basis for computing a definite capital value inherent in this contract as of the day it was taken over by the taxpayer corporation, and that there has been furnished no reliable testimony from which there could, by any possible means, be evolved a formula for translating the initial expectation of profits into terms of dollars, and that there can not be said to have existed any determinable capital value based upon this contract which is capable of having ascribed to it the kind of exhaustion which the taxing statute authorizes to be written off and deducted from gross income.  We are, therefore, of the opinion that the taxpayer's claim for such deduction must fail.